Mr. Doss? Good morning, Your Honor. May it please the Court, my name is Proloy K. Doss. I'm a lawyer with the law firm of Ford Harrison, here today on behalf of Midwest Division-RMC. Your Honor, would the Court permit five minutes for rebuttal argument? You've got 20 total. You will not get a second to do. No, you will not get a second more. OK, thank you, Your Honor. How you use it is up to you. So, thank you, Your Honor. So there are really two cases that are involved here. And let me start with the SEIU union issue, with two unions, let me start with that one. There are two overarching issues here. First, whether an employer can withdraw recognition of a union after the union members vote to decertify the union, but before the NLRB certifies that decertification vote. In this case, there's an eight month spread there. From June 2021 to February 2022. Our position is that the employer can recognize, or withdraw recognition, because the decertification vote is the best evidence of the employee's choice. Now, if we're wrong about that, the second threshold question is the remedies question. Here, the hospitals was ordered to pay a monetary damages award to the union. And the question is whether the NLRB is authorized to do that. And we do not think the NLRB authorizes that. Let me start with the decertification issue. And particularly, the at its peril rule. Because that's what the Fifth Circuit applies. The at its peril rule. The Fifth Circuit, in Akima and Dow Chemical, applies something called the at its peril rule, which means that when there's evidence, clear evidence that the members do not want to be represented by the union, the employer need not wait for how long it takes for the NLRB to certify that. It can act at its peril. It can take that evidence and refuse to recognize the union. And if the results of that decertification are later overturned, it will have committed an unfair labor practice, acting at its peril. We think that's the best rule. And Akima affirmed it in the Fifth Circuit. On page 22 of her brief, you'll see Dow Chemical explains why that's a reasonable reading. And there's two reasons Dow Chemical applied it. First, that's exactly the same rule that applies when there's an initial representation. In an initial representation vote, an employer has to recognize the union before the certification because it's the best evidence of the employee's choice. And if it does decide to challenge that election, and it acts at its own peril. What the Dow Chemical case says, it makes no sense to have inconsistent rules based on who wins and loses. Is that evidence a statutory standard or a Supreme Court standard? It is NLRB standard, Your Honor. So the Supreme Court's never blessed it? Correct. But it comes back, I guess the statutory question really comes down to the employer has a duty to bargain with the representative of its employees. When the employees don't want to be represented, do they have that obligation? That's where it comes from a statutory standpoint. And in this case, when we have evidence that the employee does not want to be represented by the union, does not want to pay dues to the union, the employer should be able to recognize that. Does it matter how close the vote was? I mean, or are you asking just for a per se rule and then the employer can make its risk-based decision? You know, if you've got a handful of contested votes and you've got a two-point decertification, are you asking for just a per se rule that at that point, if the initial result suggests the unions be certified, the employer then has the option? So, yes, we're asking the court to follow the Fifth Circuit in Akema and make sure there's no circuits split. And Akema was a one-vote difference. So I think the answer is yes. But I want to be very clear, we're on much more solid footing. The spread here was 32 votes. It was a compound question, so the answer couldn't have been yes. There's a 32-vote spread here. 13 votes were challenged. We had the most solid set of facts here with respect to any court that's had to address this. Even Dow Chemical was an 11-vote spread. And Akema was a one-vote spread. This has been presented, you presented Artema as an at-your-own-risk rule. Then you say Artema was a one-vote case. So how did the court analyze the underlying, the extrinsic evidence of the likelihood that the one vote would be either not certified or was not best evidence? No, Your Honor, I think that goes to the question of what does the spread really matter? And the answer is it's just the employer acts at its peril. It determines that it's not going to recognize the union and the... If that's the rule, and we agree, what's the remedy here? If you agree that's at the peril rule, this would render pretty much the entire unfair labor practice finding... No, doesn't there have to be more process? Don't we have to remand to the agency? Your Honor, if... To look at the underlying record and see whether the act taken at peril was an unfair labor practice. No, I'm sorry, Your Honor. Go ahead. Well, I'm going to say the answer is no because the issue about the actual decertification is no longer a question. The NLRB already certified the results. So that's completely removed out the table. It doesn't wipe out the validity of what happened before certification. Well, I guess that's what the at-the-peril rule would do. If we follow Akema, that's exactly what would happen. As I understand it, maybe I'm wrong, and clarify it for me, please. And that is the point of the at-peril rule is that you have an election result, you look at it. Whether you win by one, you win by 30, and there's only 11 votes contested, doesn't matter. Whatever those facts are, they just are those facts. You're the employer. You can say, you know, the employees have the right to reject representation by the union wherever they want, and once they've done that, they, you know, I can recognize them, right? So you just say, that's fine. You get to the certification process. If you're wrong, and the union's still the representative, and you haven't bothered to collect the dues, you owe the money to the union, right? If they certify that the election results are right, and the union's been decertified, you owe nothing. So that's the whole point of the at-peril rule, isn't it? That if you want to go trippingly ahead on a one-vote deal, you go right ahead, because in the end, it's your pocketbook that's going to pay it. I answer that question, yes, with one modification. I agree it's an unfair labor practice if the at-your-peril rule results in an elimination or reversal of the underlying decertification election. We disagree with the financial order. Because you have to pay the union. Correct, but that's a secondary issue on remedy. The only, you don't get to remedy unless there's an unfair labor practice. I will note my friends on the other side are relying on Kruger, which is an LRB decision, did the exact same thing before the Fifth Circuit, and that was rejected. We also disagree that an LRB law is settled on that. We obviously look to Johnson & Controls. But we don't think that dispute really matters, because in the post-Loper-Bright world, it's judicial interpretation that matters. And that's why we think the Fifth Circuit's interpretation is the one to follow. And the Fifth Circuit did the correct thing, in our view, to provide its rationale in Dow Chemical. This Court shouldn't deviate from that and create a circuit split. Now, my friends on the other side argue that the Seventh Circuit has not followed the at-peril rule. But we don't think that's a correct reading of Heartland, which is the case they cite for it. In Heartland, the employer failed to — withdrew recognition. And then the decertification vote was overturned. It was — a new election was held. So in that case, it's consistent with the at-peril rule. The employer acted at its peril and lost. So that — there's no inconsistency with the at-peril rule in any of the case law. I'd also note, and again, factually, like we talked about, it doesn't really matter what the vote is when the employer acts at peril. But again, we're on much firmer footing there. The vote was 17 to 18, with one unopened ballot that was being contested. The employer really had no evidence of — Robertson But it shouldn't matter, right? It shouldn't matter. Exactly right. Alito I mean, that's what — yeah. Roberts I agree. It shouldn't matter. Just pointing out — Alito I mean, if we accept your rule, it doesn't matter what the vote was. Roberts That's correct. Again, I think that the best thing — the at-its-peril rule, as Dow Chemical explains, does the best job of making initial representation and decertification votes on a level playing field. It doesn't matter who wins or loses. It creates consistency in our law. Sticking with the Fifth Circuit standard creates consistency in our law. It avoids a circuit split. And most importantly, it's the best way to honor employee choice. There is no better evidence than a vote by secret ballot of what the employees want. And if the employees don't want to be represented by a union, they shouldn't be forced to continue paying dues to the union, represented to the union, you know, based on how long it takes the NLRB to act on certifying that tally. And again, if Your Honors agree with us on the at-its-peril rule, the rest of the issues on the SEIU appeal are moot. If you disagree, then I do want to address the remedies issue. The remedy that was prescribed here was that the hospital would have to pay money damages to the union. In our view, that's improper, because we view that as an initial matter as a punitive award. And in our view, the NRA does not authorize punitive awards. And it's punitive because it harms the hospital. In no circumstance would the hospital be paying the union. The dues checkoff requires the employees to pay the union. This is the relationship between the employees. Well, has the union suffered any damages? I mean, here the union representatives were barred from the employer's facilities, right? Is there any damages for that conduct if it's an unfair labor practice, if we reject your rule? In other words, you had a period of, was it eight months here? And I believe your client barred the union reps from the facility based on the vote. Can the union recover any damages for that? Because they lost access to, arguably, their union members as they're permitted to under the statute. So our answer to that question is no, because to your point, we start off by calling this punitive and we think that's wrong. But even if they were consequential damages, our view is, particularly in light of the Third Circuit's decision in Starbucks, that that's not authorized under the NLRA. The NLRA only has the ability to give equitable relief, not legal. And a compensatory damages award or a punitive damages award are clearly legal remedies. And they, as the, we think the Third Circuit's analysis on this saying this is not permitted in the plain terms of the NLRA. Is that necessarily true? Because couldn't you make the claim that you stood in a trust relationship with the employees and part of your obligation was to collect union dues and the failure to collect those union dues under the position where you had an obligation to requires you to make restitution for your decision not to collect. I mean, that's a, you know, I mean, if you're at peril, you're at peril all the way, aren't you? I mean, if that's the decision you've decided to make, I mean, you know, whatever, you know, a derivative claim you may pursue against your employees if you get stuck doing that, I mean, that's on you, isn't it? Well, I think the answer to that is the U.S. Supreme Court's decision in Cudson, which is cited on page 13 of her reply brief. And it makes, if, Your Honor, if we had actually taken the dues out and held them and we were holding them in trust, then under an equitable remedy, we could be forced to return it. In this case, it's an actual payment from the hospital's coffers directly to the union, and those are monetary damages. That's a legal remedy. Is it a legal remedy when there are damages that arise out of the failure to collect? Yes, Your Honor, because, and I think the Cudson case makes that real distinction. So you need to, there is no sort of constructive trust obligation that can arise in the absence of the actual collection and holding of the funds. Right, because it's a pure money damages award, whether you call it consequential damages or punitive damages, it's a pure money damages award when you're ordering money that hasn't been earmarked. It's literally money from the hospital's coffers. I mean, the money that's been earmarked has already gone back to the employees. If there was going to be kind of an order, that should come back from the employees. The money here is separate and apart from the money that was paid to the employees that would otherwise have gone to the union. So your decision is not solely at your peril. Yeah. Right. You know, it's like you're going to pass on half the peril to your employees. Well, we disagree, again, that the award of monetary damages should come in the first place. And again, we asked the Court to follow Starbucks on that. I do, I'm running out of time. I do want to, in full disclosure, point out while we asked the Court to follow Starbucks, the Ninth Circuit has since, in Macy's, disagreed with that and concluded that consequential damages are available under the NLRA. That was a 2-1 decision that's currently pending on a petition for reconsideration that's been fully briefed. So I don't think that's the last word from the Ninth Circuit. But I do want to, in full candor, say that the, there is adverse opinion from the Third Circuit. We do think the Court should follow the Third Circuit's decision in Macy's and say the NLRA does not authorize legal remedies, and that's what this is here. Forty-five seconds to go. I just want to touch on the NNLC issue very briefly. Pure issue of contract construction. It's reproduced on page 48 of our brief. The contract's clear that the employer had to recognize only one representative of the grievant. It did that. That's not an unfair labor practice. It can't be an unfair labor practice when you just comply with the plain terms of the contract. And then, I guess, if there are any other questions, we just ask that our petition be granted and the petitions of the union and the NLRB. Doesn't matter that there, I mean, and I might be wrong on this because I can't remember, but I seem to recall that the union was named grievant in this case, as was an employee. Is that wrong? And in that case, don't they each get one? The stipulations that the grievance was filed over just a transfer of patience, I think that the plain language, again, just it's really... Because it's one issue, there's one lawyer, is that what it is? Rather than, because, like I said, when I went back a couple weeks ago, I looked at it and I thought I saw two named people, but I might be wrong. The language is completely singular, the grievant. And so, again, we're just divided by the plain terms of the contract. But what if there's two grievants? See, that's what I'm saying is I think there may have been two grievants in this case. So the plain language would say the grievant, there would be two of them. I'd have to go back and look. Our reading is that when you're dealing with a single grievance, it's an issue that you're only entitled to that one, under our contract, that you're only entitled to that one representative. Again, I think the plain language is set forth on page 48. So if there are no further questions, again, we ask that our petition be granted. Thank you, Your Honors. Print pamphlet? Oops, sorry. Good morning, Your Honors, and may it please the Court. My name is Amanda Hanson, and I am appearing here today on behalf of SEIU Health Care, the union, in its capacity as petitioner and not as intervener. We are intervener in the other two cases that have been solved. Speak more clearly for me. Sorry about that. I am here in my capacity as the attorney for SEIU Health Care in its capacity as a petitioner, not the intervener. I won't take too much of a time. I only have four and a half minutes anyway left, because the main issue really is here the merits, not so much to know this reading remedy, which is our issue on our petition for review. SEIU Health Care challenges only the Board's decision to deny SEIU's request for a notice reading remedy. Again, SEIU is not challenging the Board's order on the merits. We think the merits were correctly decided and should be enforced. Turning to the notice reading remedy here, the Board denied SEIU's request for a notice reading remedy under current Board law and that it could create confusion amongst the employees because two years had passed since the certification in February 2022 and the Board's order in March 2024. With respect to the first rationale given by the Board, it's SEIU's position that the Board abused its discretion in denying the notice reading remedy because it failed to follow its own current Board law. Current Board law is to allow the issuance of a notice reading remedy when the employer's unfair labor practices were numerous, severe, and widespread, and especially I understand the general thing, but specifically now, am I right that at the time we're talking, at the time we will be talking about, the union was back in place under a new collective bargaining agreement? Yes. Right before the election, the ballot count, the union and the employer ratified a new collective bargaining agreement that went into effect, I think, March 2024. Sorry about that. I'm moving faster to something. That is fine. I apologize. The new CBA agreement went into effect, I think, in March 2021, a couple of months before the June 14th ballot count. Does that answer your question? Well, I don't understand why the union needs a notice reading now. I mean, I understand sort of the environmental difference between posting and reading, but given where things stand today, I don't understand why the union needs to rub it in, so to speak. I would disagree that we want to rub it in, but I will point out... For lack of a better explanation of what I think the union's motivation is. I will point out that in one of the cases cited by the NLRB, which is... One second. Homer D. Bronson, the board did issue a notice reading remedy six years after the ULPs were committed, so this is less than the six-year mark, so the time lapse really doesn't make a difference. When, as here, the employer's actions were egregious, they were in clear violation of the known unambiguous board law, which is W.A. Kruger, and it was committed by the highest level of research. The CEO, the top of the top, sent an email the night after the June 14th ballot count that falsely told employees that they were no longer represented by the union. That is not true. So when it comes to those... That's a rub it in argument. My question was more pragmatic. What does the union need in terms of its relationship with its members? Why does it need reading versus posting where things are today? I think part... And I understand your question. I think part of it is at this point, because you're right, the union has been officially decertified. We're out. We can't claim we're not back in. We understand that. However, when these violations are so egregious and severe and widespread, it really is to make sure, unlike a notice posting, that the employees are aware of their rights. But in this case... What was widespread about this violation? Pardon? You said it was widespread? Yeah, when the employer sent out, the CEO sent out that email, it went out to all employees in the bargaining unit. It went to everybody. So every member in the unit was falsely told the union was not there. But to answer Judge Loken's specific question, the notice reading is important so that management acknowledges they are bound by the act and they violated the act. And that employees are aware that management is aware that the act applies to them. You're out of time, but I'll give you... I would observe that your argument falls flat under our standard of review. All you are making is an argument that, well, the board should have done something different here, and you can't or haven't given me a real people reason why we should second-guess the board on a sort of happens all the time remedy question. To answer your question, I do understand and I do not disagree that the board or the Eighth Circuit, along with the other circuits, do review remedy issues with abuse of discretion. That's a pretty high standard. But I'll set out in Detroit Edison that the law does not allow arbitrary action. And the board has consistently stated that a notice reading remedy is appropriate when three or four factors are present, and it is objectively clear in our opinion that those four factors are present, then the board is acting arbitrarily and it's ignoring its own law that has applied over the years. And it refused or just did not apply in this particular case when the objective facts, and they're undisputed, are there. Thank you very much. Good morning, Your Honors. Greg Laro for the National Labor Relations Board. Want to make sure you can hear me okay this morning. I am here on behalf of the board asking for enforcement of the board's order. I would like to get right into it and start with the first and major question that came up today, which is the issue of the withdrawal of recognition. In this case, the board applied a longstanding rule that says in the particular context of a decertification election, an employer may not repudiate its agreement. We have an existing agreement here. And withdraw recognition from the union based just on the results of an election that are still in doubt because it's yet to be certified. What are you quoting now? Well, I am referring to the board standard. Are you reciting judicial authority? I am citing board and judicial authority here. This is the rule that the board laid out in Kruger and that was approved by the Seventh Circuit in Heartland. Kruger has never been straight up endorsed by a circuit court, to my knowledge. Am I wrong? This is important. I believe that in Heartland, the Seventh Circuit laid out the rules. That was not a straight up vote of approval for the Kruger principle across the board. Your Honor, fair point, but I also want to be clear and hold the line. The Kruger rule has never been upheld, so to speak, by a circuit court, much less the Supreme Court. The board's position is that in Heartland, the Seventh Circuit held that an employer cannot just walk away, withdraw recognition or repudiate an agreement in the time between an election and it being certified because the court said, and I'm paraphrasing here, the court said, in that situation, while you're awaiting certification, the employer's obligations are the same as they were before. Why does one rule apply for certification and one apply for decertification? What's the logic behind that? Excellent question, Your Honor, and I want to get right into that. The board in crafting this rule was facilitating two key purposes of the Act, which are labor peace and stability and ensuring employee-free choice of representative. Now, when we preserve stability, what we're really doing is having the status quo stay until you figure out whether the election was proper and represented uncoerced wishes of employees. But that status quo is very different in the two situations, indeed in some ways opposite. In an initial election, the status quo is you don't have an existing bargaining relationship between the employer and the union. The employees don't yet rely on a representative because they don't yet have it, and the status quo is go ahead and make unilateral changes. That's the initial election. In the decertification context, it's the opposite. You have an existing bargaining relationship. The employees have a representative they've gotten used to relying on, and their status quo rule is don't make unilateral changes. Now, you're right. It's an interesting question. In both types of elections, the general policy is the same, which is don't rock the boat, don't fundamentally change the relationship. What we're waiting to see, whether the results of the election are finalized. But you have different rules in different contexts because the relationships and expectations are so different in the two situations. And that's what the Board and the Court in Heartland stressed, which is the significant differences between these two types of elections and the two types of relationships and the two types of status quos that you have. Either way, you preserve the status quo. But in a decertification election, the status quo you're proving, you're preserving is you have a relationship. In this case, you also had a contract. And my opponent doesn't cite law saying go ahead and repudiate an existing contract. That's not what Johnson Controls says or the other cases they say. But I'd also like to speak to the other main goal here, which is ensuring employee free choice of representative. My opponent says a vote is the best evidence, except settled law says not so fast. The best evidence is a valid election. You don't know it's valid when objections are pending because those objections Well, you do. I mean, in this case, you were, so to speak, well outside the margin of error, right, on the contested votes? That's not a legal terminology. I mean, that may be a stronger argument in different factual situations. Do you agree with that? Well, not necessarily, Your Honor, because it's not a margin of error in terms of how many votes are challenged, though I understand your point. It could be, you know, as was alleged here. The rule isn't, but your argument is. Well, Your Honor, what I'm saying is when you have election objectives pending, often the issue is did either side, because either side can do objections, the employer has that right, too, can say that the other side engaged in activity that tainted the election. It's not a numbers game. The whole thing might have been tainted. You might have engaged in coercive conduct. You might have offered improper benefits. So you don't know until that issue is resolved whether the election represents the free will of the employees. And I'd like to point out Well, does that apply on the initial certification vote as well, that thinking, or not? Well, I think the validity of the election is the same, but that's a great question because you're dovetailing two policies. We also have to remember you're preserving the status quo, which is very different in the initial election. So, yes, you still want to make sure the election is right. Your first point, it's different, but your second point goes the same direction on a certification and a decertification. Right. But what's different is how do you put that all together? What the Board has done is exercised its authority to craft rules for specific situations, and it's carefully looked at all the factors you have in the decertification situation. And carefully noted how that can be significantly different on the status quo side, the reliance side from an initial election, and properly crafted a different rule. And I was going to note Well, even though the same underlying fundamental issue is that there has been some structural error in the conduct of the election, because we're not concerned about the margin of the vote, that somehow the results is necessarily different because of the nature of the status quo. I mean, it seems to me that a cynic might look at the whole thing as it just seems that the Board's real policy is that the union wins. Well, no, the Board's policy is not that the union wins because it's actually looking to see what the election says. Well, it kind of does, but it does say that because if there may be a structural error, and that's the nature of the appeal, we automatically say the union's not representing them, right, at the initial election. Well And then on the next one we say, but you can't change anything. So you have to change something in the first instance, but you can't change something in the second instance when the underlying claim is exactly the same. Well, Your Honor, the way I would put it is that the Board is doing the same overall thing either way, which is saying let's preserve the status quo the way things are. Let's not have fundamental changes to whatever the existing relationship is until we know the election is valid. But that existing relationship that you're not changing is very different. And the impact of allowing changes is very different. And I was going to point out, even Arkema, in a way, the Fifth Circuit case my opponent relies on, acknowledges this. Because where I was going was my opponent wants to say a vote is the best evidence, and I want to say, because the Board and courts have, that a certified vote is the best evidence. Arkema agrees. It says at footnote 11 that a, quote, valid election is the best evidence. But you don't know whether it's valid when there's objections and the validity of the election is in doubt until you have a certification saying it's valid. But you also have to dove that with the different bargaining relationships and status quo you have. And when you put that together, I submit the Board, carefully considering all of that, crafted a reasonable rule that pertains to the specific situation, the decertification election, all the factors we've discussed.  Footnote 11 was just acknowledging that the Board disagreed in Leavitt's. I'm sorry. It may have been footnote 10 or 11. If I get the number wrong, I apologize. This change in standard does not suggest this Court's rule. It's no longer proper. A valid election would demonstrate an actual loss of majority support. We remain bound by this circuit's precedent. There's no effort. There's no extra effort there. The Court is suggesting that it's got to be certified to be valid. Well, that's what I'm saying is the Court's acknowledging, what the Court's acknowledging is don't just give me an election, give me a valid one. I'm not trying to put words in that Court's mouth. That's what we're saying. We disagree with that. We're sticking with our prior rule. Okay. If I may, Your Honor, two things about Arkema and Dow are a couple things we should acknowledge here, because I know the Court's trying to figure this out. You've got the Board, and I would argue at least in part Hartland and the Seventh Circuit on one side, the Fifth Circuit on the other. In Arkema, what you won't see is a discussion of the very important factors we discussed this morning, which is how do you deal with the fundamental differences between the relationships you have or don't have in a decertification context as opposed to an initial election? Is that a legal inquiry? And how do we, I mean, the Board's asserted, you're asserting the Board's position here. What's our standard review of that, and is that a legal question? Well, as we point out, I believe it's at page 17 and 19 of our brief, decades of Supreme Court precedent followed by this Court, and we cite the cases say that it's, the Board has the primary responsibility to mark out the duty to bargain. So its assessment and creation of rules under that is not lightly put aside. And here the Board Well, what is the standard of review, then? Not lightly put aside, or is it deferential, or has that changed recently? I believe the Supreme Court has said it's deferential, and what the Board has to do is reasonably exercise. So we're deferring to the agency on a question of law? Following Supreme Court precedent What case? Well, we cite Litton and we cite Ford Motor. And when are those cases? Ford Motor is decades ago. We cite cases before and after Chevron, which is the one case Loper overrules, because I know you're talking about Loper. And to be fair, I want to point out, because I understand that's how things work sometimes, this argument about Loper What about Jefferson Standard? What about it, Your Honor? It doesn't endorse what you're saying. The Supreme Court threw away what the Board had decided. I don't recall off the top of my head what Jefferson Standard did, because that case wasn't cited. Something I wanted to very quickly say is my opponent cited a standard of review for each issue in their initial brief. They did not cite Loper for this issue, Section 8A.5. So I'm doing the best I can on something I haven't had a chance to brief. But what I stand by strongly is that when you look at a brief, page 18 through 19, we're saying that Congress, according to decades of Supreme Court precedent, made a conscious decision to delegate to the Board the primary responsibility of marking out the scope of the statutory duty to bargain, like here. What is your duty in this particular decertification context? We cite Ford Motor. We cite Litton. We cite Randall and cases from this Court. And I would submit that Loper doesn't change that. With the caveat, I haven't had a chance to fully brief the Court on the issue because of the timing of its presentation. But at the end of the day, and we summarize this at page 34 of our brief, the Board crafted a well-reasoned solution to a particular problem of a decertification election, and it explained why it's a different rule than for the initial election context. It's the same idea, which is preserve the status quo until we know the election was valid and what the real result was. But it's a different rule because it's a different situation and a different balancing of employee free choice and preserving the status quo in industrial peace. And I submit that was a reasonable effort at the end of the day. And if I may, Your Honor, I just want to make sure there aren't some other things that my opponent raised that we should discuss. We went through how, in the Board's view, the vote itself isn't necessarily the best evidence of the employee's wishes. We talked about how the at-its-peril rule, that's the one for the initial election, is for initial elections and why. It's dealing with a very different situation. And we talked about how other cases my opponent cited, like Johnson Controls, aren't supporting what the employer wanted to do here or did here, which is repudiated existing collective bargaining agreement. And we haven't touched on the other issues in this case. I'm happy to talk about any of them. I know a lot of other issues have been presented, but it depends on whether the Court has questions on those points. You know, the Board's view is the remedy, the remedies that have been discussed are within its discretion, that the other violations, many of which flow from the unlawful withdrawal of recognition, are supported by substantial evidence. So unless Your Honors have further questions, I thank you for your time. Well, I think their remedy argument, particularly in light of Janus, is there's some force. In which remedy argument is that, Your Honor? Sorry, there were two remedies discussed this morning. Yes, both of them, forcing them to pay union dues in this situation. Particularly if it's not a willful violation. And I know that's, so that's another issue. Oh, well. And then why, and barring them from looking to the employee for, to prevent the double, you know, double benefit. Well, a couple things, Your Honor, and this is all laid out in our brief. I would point out, first of all, that the order, and I believe we described this and I know I got the footnote number wrong a while ago. I think it was about page 54, footnote 11 of our brief, and at page 3 of the Board's decision, provides for an offset. There's not double recovery or windfall here. But more fundamentally. Offset how? You're not going to get money from the union that they've already gotten from employees. There is a mechanism there. You've got to speak up. I'm just not. I'm sorry, Your Honor. There is an offset mechanism in this. It says that the reimbursement requirement will be offset by the amount of any dues SCIU collected in the compliance period from employees that are covered by the payment order. So right off the bat, there isn't this double recovery issue. But more fundamentally. I didn't mean double recovery by the union. I meant the employees getting the benefit without having to pay the dues. Okay. Your Honor, if I may, because I'm very happy to have the chance to explain why I think the remedy is valid under the applicable standard of review, which is. That's what I was asking you to do. That's what I'm trying to do, Your Honor. Thank you. It is an abusive discretion standard. And I think this is a reasonably crafted remedy here to restore to the parties to the position they would have had absent the violation. And the violation is you have an existing contract. It says the employer has to take and remit dues to the union. That's what the union lost through no fault of its own. The money is the dues it would have gotten from employees who had valid authorization forms. The union lost that money. Now, it wouldn't be fair to go take the money from the employees. They're the other innocent victim in these violations. And they would have denied. Well, it's money they would have paid anyway, right? Yeah. What's unfair about that? The money was the quid pro quo for receiving representation, which they couldn't get because of the employer's violations. So the idea here is to put the burden on the wrongdoer, not the innocent parties. And if there's some doubt here, it is settled that the wrongdoer shouldn't benefit from the confusion caused by their wrongs. What is clear here is the employer violated the Act. The union was hurt. The employees were hurt. And the burden should fall on the party that did the violation to make the union whole for what they lost, which was the dues. But the employees voted. We don't want representation. We don't want to have to pay the dues. And so now the dues are being collected by someone who you are calling a wrongdoer. But the employee said, we don't want to pay. We don't want to pay those dues. We vote against you. I understand, Your Honor. That's repeating the issue with the withdrawal of recognition. Here, the withdrawal of recognition is unlawful and repudiating the contract. You can't repudiate an existing contract by failing to honor its terms. That's what the employer did. And I submit there was harm to the union. This remedy makes it whole. The Board did not make up a new remedy here. We cite support for it in our brief. It's not a brand new remedy. The CBA had expired, right? No, Your Honor. They repudiated an existing agreement. I know it's confusing. By the end of the period we're talking about. They filed a petition, and a couple days later, the parties reached a new agreement. And I think that went through 2024. It covers the period in question. Is this still before the old one? I haven't looked at the dates for a while. I thought we were in the post-expiration bargaining period. We are now. No, then. Not then. At the time the employer withdrew our recognition and stopped collecting dues, there was an existing agreement, I believe, Your Honor. 5-31-20. Negotiations began 5-14-20. Announced wage increase. Yeah. It expired 17 days after negotiations began. Unless I've got this all wrong. Go ahead. Well, I thought, Your Honor, that a new collecting bargaining agreement was reached for a two-year period that went into 2023. But anyway, my understanding is the bargaining agreement, they extended for negotiations. It expired February 28, and RMC stopped paying dues. The employees filed a decertification petition on March 29. The union ratified the successor collective bargaining March 31, effective April 6. So now, and then, so they're being, so then they started paying dues after April 6. Right, and then they stopped while the agreement was in effect, is my understanding, Your Honor. But at the end of the day, this is a remedy that's within the Board's settled discretion and consistent with precedent, serving the goal of making the union whole for the losses they suffered in a situation where you wouldn't want to put that burden on the innocent employees. And the one question the Court asks, under its own precedent in the Supreme Court, is, is this remedy an abusive discretion where you would say it's an attempt to achieve ends which cannot be said to further the Act's goals? I don't think that can be said here. I don't think that standard is met, Your Honor. Thank you, Your Honors.